UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

                       Plaintiff,                   **<u>Memorandum and Order</u>**

    -against-                             02-CV-4800 (JMA)

UNITED STATES CURRENCY IN THE
SUM OF SIX HUNDRED SIXTY
THOUSAND, TWO HUNDRED DOLLARS
($660,200.00), MORE OR LESS,

                       Defendant.
-----------------------------------------------------------X

APPEARANCES:

Steven L. Kessler
Law Offices of Steven L. Kessler
122 East 42nd Street, Suite 1350
New York, New York 10165
*Attorney for Claimant Sammy Khalil*

Louis M. Freeman
Freeman, Nooter & Ginsberg
30 Vesey Street, Suite 100
New York, New York 10007
*Attorney for Claimant Abdel Soliman*

Roslynn R. Mauskopf
United States Attorney
One Pierrepont Plaza
Brooklyn, New York 11201
        *By:    Douglas A. Leff*
              *Assistant United States Attorney*

**AZRACK, United States Magistrate Judge**:

      This action arises from the seizure of $660,200 in United States currency from a suitcase at

John F. Kennedy International Airport (Dkt No. 1: Compl. ("Compl.") (08/30/02) ¶ 1). The

government commenced civil forfeiture proceedings *in rem* for the entire amount of currency

pursuant to 31 U.S.C. §§ 5316 and 5317 (Compl. ¶ 3). While the suitcase bearing the currency was not theirs, nor were they present at the airport during seizure, Abdel Moneim Soliman[1] and Samy Khalil filed claims to the currency (Dkt No. 3: V. Claim Resp. to Compl. (11/07/02)). Judge Nicholas Garaufis referred the parties to me for all discovery and settlement purposes. On February 9, 2005, the parties appeared in my courtroom and finalized a settlement agreement (Dkt No. 28: Mins. (02/09/05)). Almost six months later, claimants filed a motion to enforce the settlement (Dkt No. 32: Mot. to Enforce J./Settlement Agreement (08/09/05)). By stipulation dated November 30, 2005, the parties consented to have me preside over this case for all purposes, including entry of judgment (Dkt No. 52: Consent to Jurisdiction by U.S. Mag. J. (12/14/05)). Accordingly, I have considered claimants' motion to enforce the settlement. For the reasons stated below, claimants' motion to enforce the settlement is granted.

## BACKGROUND

On April 30, 2002, agents of the United States Customs Service, Contraband Enforcement Team seized $660,200 in United States currency outbound at John F. Kennedy International Airport (Compl. ¶¶ 11-12). Upon searching the luggage of passengers Hassan and Afaf Al-Sadawi, the agents found the currency concealed in boxes of crackers, baby wipes and oatmeal (Compl. ¶ 14). In November 2002, Samy Khalil ("Khalil" or "Claimant") filed a Verified Claim Responding to the Complaint *In Rem* for the seized currency. Subsequently, Abdel Moneim Soliman ("Soliman" or "Claimant") also filed a claim for the currency.

---

[1] The attorneys in this matter have used the following alternating spellings for Claimant in documents submitted to the Court: "Soliman" or "Solimon." Because Claimant's attorney used the "Soliman" spelling in his correspondence with the Court, that spelling will be applied throughout this document.

On March 12, 2003, I held an initial conference and set a discovery schedule. Over the next twenty months, the parties engaged in extensive discovery, including substantial document review as well as depositions. At the close of discovery, I presided over two settlement conferences between the government and claimants. On February 9, 2005, the parties appeared for a final settlement conference. Steven Kessler ("Kessler"), Khalil's attorney, and Assistant United States Attorney Tracey Knuckles ("AUSA Knuckles"), appearing on behalf of the government, represented to me that they had reached a settlement; however, the agreement could not be finalized until Soliman's claims were also resolved. Soliman's attorney, Louis M. Freeman ("Freeman") was present for the settlement discussions as well. All three parties argued their positions on the settlement of Soliman's claim and, with my assistance, arrived at an agreement. I called a recess, during which, upon my instruction, the parties consulted with their respective clients and supervisors to secure approval for the proposed settlement. After the recess, AUSA Knuckles reported that she had discussed the proposed settlement with, and received approval from, the Deputy Chief of the Asset Forfeiture Division, Assistant United States Attorney Richard Weber ("AUSA Weber").

Under the terms of the settlement, claimants agreed to forfeit $312,600 to the United States. The government agreed to return $17,500 to Soliman, $7,500 of which was to be used to satisfy a fine issued to Soliman in the criminal case, United States v. Abdel Soliman, 02-CR-0901 (E.D.N.Y. 2003) (NGG). It was agreed that a portion of the money going to Soliman would come from the funds already settled by the government for return to Khalil. The government agreed to return the remaining $330,100 to Khalil with all interest earned on the defendant currency. All parties accepted the terms of the settlement. At the close of the conference, AUSA Knuckles advised me that she would draft a written settlement agreement and forward it to claimants' attorneys.

Following that settlement conference, Kessler and AUSA Knuckles discussed via telephone minor points to include in the settlement agreement, such as what portion of the settlement amount was to be interest, what portion was to be principal, and the procedures for paying the settlement (Dkt No. 32: Decl. of Steven L. Kessler, Esq. In Supp. of Mot. To Enforce Open-Ct. Settlement Agreement ("Kessler Decl.") (09/30/05) ¶ 7).  On March 8, 2005, Knuckles mailed the Stipulation of Settlement and Decree of Forfeiture ("Stipulation") to both Kessler and Freeman for execution (Id. Ex. C).  On March 9, 2005, immediately upon receipt of the Stipulation, Kessler contacted Knuckles to resolve minor issues with the document, all of which were resolved over the telephone (Id. ¶ 9).  Both deemed alterations to AUSA Knuckles' original Stipulation unnecessary (Id.).

AUSA Knuckles informed Kessler that, in order to set up the wire transfer of the settlement funds to Kessler's escrow account, he should contact Toni Davis ("Davis"), a United States Treasury Department representative (Id. ¶ 10).  Kessler spoke with Davis that same day and arranged for Davis to fax him the ACH Vendor/Miscellaneous Payment Enrollment Form to set up the wire transfer (Id.).  Kessler filled out the form with the agency, payee, and financial institution information and faxed it back to Davis that same day (Id. ¶ 10, Ex. D).

During the subsequent week, Kessler and Khalil executed the unaltered March 8, 2005 Stipulation (Id. ¶ 10).  On March 17, 2005, Kessler mailed AUSA Knuckles the executed Stipulation with a request that she "execute [the] same and return to [him] a fully executed Stipulation signed by the Court" (Id.. ¶ 11, Ex. E).  In addition, he thanked her for "expediting the processing of the wire transfer" (Id. Ex. E).  Three weeks passed without the Stipulation being finalized (Id. ¶ 12).  Kessler was unable to reach AUSA Knuckles until April 13, 2005, at which time she informed him that she would execute the Stipulation and authorize the release of the funds once she received the

executed Stipulation from Freeman and Soliman (Id.). On April 18, 2005, Freeman and Soliman mailed their executed Stipulation to AUSA Knuckles (Id. ¶ 13).

Throughout the remainder of April and into early May, Kessler attempted without success to contact AUSA Knuckles to confirm that she mailed a fully executed Stipulation and authorized the transfer of the funds (Id. ¶¶ 13-14). On May 3, 2005, Kessler contacted Davis at the Treasury Department, and Davis instructed him to speak with Patricia Hank, whom Kessler was inevitably unable to reach (Id. ¶ 14). After continued, unsuccessful attempts to contact AUSA Knuckles and additional conversations with Davis on June 1, 2005, Davis instructed Kessler to speak with Todd Smith ("Smith"), the Associate Chief Counsel at the United States Customs Office (Id. ¶ 15). When Kessler eventually reached Smith, Smith informed him that AUSA Knuckles had resigned her position with the government on the previous business day, May 27, 2005 (Id. ¶ 16).

Kessler and Freeman immediately called chambers to apprise me of the situation. I advised them to find out which AUSA had been assigned to the matter so that they could finalize the settlement. Subsequently, in June 2005, Kessler learned that the matter was reassigned to Assistant United States Attorney Douglas Leff ("AUSA Leff") (Id. ¶ 18). When Kessler finally spoke by telephone with Leff, Leff informed Kessler that he had just been assigned to the case, and, while unfamiliar with the file, he knew that the government had decided not to finalize the settlement (Id. ¶ 18). On June 6, 2005, I conducted a telephone conference with all the parties, during which AUSA Leff informed me of the government's intention not to execute the Stipulation. At Leff's request, I held another telephone conference with the parties on June 28, 2005, at which time he again informed me of the government's refusal to finalize the settlement stipulation. At that point, claimants advised that they wished to move to enforce the settlement.

Thereafter, claimants moved to enforce the settlement and to recoup their costs and attorneys' fees under the Equal Access to Justice Act.  In response, the government argued that (i) the Assistant United States Attorney who appeared at the settlement conference did not have authority to bind the government to a settlement, and (ii) the parties did not intend to be bound until a final settlement agreement was executed.  On March 8, 2006, I held a conference, at which time I determined that a hearing was necessary to establish an accurate record for this matter (Dkt No. 55: Mins. (03/08/06)).  Before a hearing date was set, I received a letter from the government, submitting that "a hearing concerning the proposed settlement is not necessary" and requesting that "the Court decide the pending motions on the basis of the papers submitted" (Dkt No. 54: Letter from Leff to the Honorable Judge Azrack (03/15/06) at 1 ("03/15/06 Leff Letter")).  In its letter, the government "concede[d] that it intended to enter into the oral settlement at issue and intended to enter into the written settlement agreement" (Id. at 1-2).  However, the government maintained its position that the settlement agreement was not binding because "it was not executed on behalf of plaintiff United States" (Id. at 1).  Thus, as the government requested, I withdrew the order for a hearing (Dkt No. 57: Order (03/15/06)) and will "decide the pending motions on the basis of the papers submitted" (See 03/15/06 Leff Letter at 1).

## DISCUSSION

I.    **AUSA's Knuckles & Weber had Authority to Bind the Government to the Settlement**

The government has inconsistently raised and feebly argued the issue of attorney authority throughout the briefing of this matter.  In its initial reply papers to claimants' motion to enforce the settlement, the government did not argue that AUSA's Knuckles and Weber lacked the authority to

bind the government; rather, the government argued that the oral settlement was not intended to bind the government in the absence of a written and executed settlement stipulation (Dkt No. 37: Gov't Mem. in Opp'n to Claimants' Mot. to Enforce Settlement ("Gov't Mem. in Opp'n") (08/26/05) at 7-13). In subsequent correspondence to the Court, the government altered and expanded this argument, stating that its intent not to be bound by the unexecuted settlement was evinced by the fact that "AUSA Knuckles was not authorized to bind the government other than in writing . . . ." (Dkt No. 52: Letter from Leff to the Honorable Judge Garaufis (10/17/05) at 1 ("10/17/05 Leff Letter")). As with the initial reply papers, in the government's March 15, 2006 letter, the issue of authority was not addressed directly; however, the government conceded its intent to enter into an oral and subsequently written settlement agreement, yet maintained it was not bound because the agreement was never fully executed (03/15/06 Leff Letter at 1-2).

The government's reassertion that it was not bound to the oral settlement is comprised, in part, of its claim that AUSA Knuckles was not vested with the authority to bind the government (See 10/17/05 Leff Letter at 1). Because the government did not concede the issue of authority and continues to maintain that the unexecuted stipulation is not binding, I must address the AUSA's authority. Based on the discussion below, I find that AUSA Weber had actual authority to orally bind the federal government to the terms of the settlement and that AUSA Knuckles had actual authority to bind the government through the drafted and transmitted Stipulation.

The Second Circuit has adopted, and frequently reaffirmed, the "undisputed" and fundamental principle that the decision to settle a case rests with the client alone. United States v. Int'l Bhd. of Teamsters, 986 F.2d 15, 19 (2d Cir. 1993) (citing United States v. Beebe, 180 U.S. 343, 350-53 (1901)); Fennell v. TLB Kent Co., 865 F.2d 498, 501-02 (2d Cir. 1989). While this principle

is well established, "if an attorney has apparent authority to settle a case, and the opposing counsel has no reason to doubt that authority, the settlement will be upheld." Fennell, 865 F.2d at 502 (citing Int'l Telemeter Corp. v. Teleprompter Corp., 592 F.2d 49, 55 (2d Cir. 1979)).

The instant matter involves asset forfeiture under the United States Code; thus, "the scope of the agent's authority is determined according to federal precedent." Int'l Bhd., 986 F.2d at 20 (citing Fennell, 865 F.2d at 501). Precedent does not require claimants to prove that AUSA's Knuckles and Weber had authority to bind the federal government. Rather, it is the government's burden, as the party asserting lack of authority, to prove that Knuckles and Weber did not have authority to settle with claimants. See Gilbert v. United States, 479 F.2d 1267, 1268-69 (2d Cir. 1973). See also Artha Mgmt., Inc. v. Sonia Holdings, Ltd., 91 F.3d 326, 329 (2d Cir. 1996) ("[A]ny party challenging an attorney's authority to settle the case . . . bears the burden of proving by affirmative evidence that the attorney lacked authority.") (emphasis added). The Second Circuit has qualified that burden as "not insubstantial." Int'l Bhd., 986 F.2d at 20 (citing Surety Ins. Co. of Cal. v. Williams, 729 F.2d 581, 583 (8th Cir. 1984) (holding that defendants "carry a heavy burden to establish that their attorney acted without any kind of authority . . . [and] in meeting that burden [they] may not rely on [ ] conclusory affidavit[s], but must establish through competent evidence that their attorney lacked actual, implied, or apparent authority . . . .")).

The procedure for settling asset forfeiture cases in the United States Attorney's Office (the "Office") for the Eastern District of New York is set forth in the Affirmation of Elaine D. Banar ("Banar"), the current Chief of the Asset Forfeiture Unit (Dkt No. 37: Affirmation of Elaine D. Banar ("Banar Affirm.") (08/24/05)). Banar currently holds the position that Weber formerly occupied. Banar or one of the Deputy Chiefs of Asset Forfeiture reviews all "proposed stipulation

agreements concerning forfeiture <u>prior to their transmission to a claimant's attorney</u>" (Banar Affirm. ¶ 3) (emphasis added). All "proposed final stipulation agreements . . . must be in writing and <u>must be approved</u>" by Banar or one of the Deputy Chiefs "<u>prior</u> to their transmission to a claimant's attorney (<u>Id.</u> ¶ 4) (emphasis added).

According to Banar,

> No AUSA is authorized to enter into a binding verbal agreement to settle a forfeiture action. AUSA's may receive approval to verbally contemplate certain terms of a settlement with a claimant's attorney, but the specific terms of the settlements must be placed in written form and approved by [Banar] or one of [her] Deputy Chiefs prior to their transmission to a claimant's attorney

(<u>Id.</u> ¶ 5). Once the AUSA receives approval for the settlement, the Stipulation is mailed to the claimants for their review and execution (<u>Id.</u> ¶ 6). When the Stipulation is returned to the AUSA, the final step for that AUSA is to "execute the agreement on behalf of the United States Attorney's Office" (<u>Id.</u> ¶¶ 7-8). There is no indication, whatsoever, in Banar's Affirmation that the Office manual, regulations, procedures or customs require that the Chief of Asset Forfeiture or the Deputy Chiefs reviewing the proposed settlement seek approval from outside the Office at any point prior to their approval of the Stipulation.

## A. AUSA Weber had Actual Authority to Orally Bind the Government

As stated above, it is the government's burden to prove that the AUSA's involved did not have authority to bind the federal government. Not only does the government fail to meet this burden; but, rather, the Banar Affirmation conclusively establishes that AUSA Weber had actual authority to orally bind the government to the settlement. Banar states that she has direct authority to approve final Stipulations <u>before</u> AUSA's mail them to claimants for execution. Weber, the Chief

of Asset Forfeiture, wielded the same authority that Banar currently has to approve all settlements in the division. Thus, Weber had actual authority to bind the government to the settlement agreement, as he had the final authority to approve the written agreement, prior to its mailing to counsel.

The government crafted a convoluted argument that AUSA's Knuckles and Weber were not authorized to orally agree to a settlement, contending that the Department of Justice procedures do not allow AUSA's to approve forfeiture settlements because settlements require the approval of the Asset Forfeiture Office of the Criminal Division (Leff 10/17/05 Letter at 2).[2] The appropriate guidelines for settling an asset forfeiture matter in the Asset Forfeiture Division of the United States Attorney's Office are found in 28 C.F.R. §§ 0.171(a)-(b) and 28 C.F.R. Pt. 0, Subpt. Y, App., Directive No. 14-95 §§ 1(b)(1)(a)-(c).[3] This was a routine asset forfeiture, under which Directive

_____

[2] The government argues that Attorney General Order No. 1598-92, titled "Redelegations of Authority to United States Attorneys, Deputy Assistant Attorneys General, Section Chiefs, and Director, Asset Forfeiture Office, in the Criminal Division," is the applicable regulation for this matter (Leff 10/17/05 Letter at 2). This statute does not apply to this matter, as it applies only "in cases delegated to the Assistant Attorney General of the Criminal Division. 28 C.F.R. Pt. 0, Subpt. Y, App., Attorney General Order No. 1598-92 § (a)(1)(A)(i) (1992). Because the government has offered no proof that this asset forfeiture matter was delegated to the Assistant Attorney General of the Criminal Division, Order No. 1598-92's requirement that any settlement in which the original claim exceeds $500,000 and the settlement amount is more than 15 % of the gross amount does not apply to this matter.

[3] The Appendix to Part 0, Subpart Y defines the role and parameters of the United States Attorney's Office in settling asset forfeiture claims, as follows:

Delegation to the United States Attorneys, Branch, Office and Staff Directors and Attorneys-in-Charge of Field Offices . . . with respect to matters assigned or delegated to their respective components are hereby delegated the authority to:

(a) Accept offers in compromise of claims on behalf of the United States;

. . .

(ii) In all cases in which the gross amount of the original claim was between

10

No. 14-95 applies, and the settlement in this case was for $347,600, which "does not exceed $500,000." <u>See</u> 28 C.F.R. Pt. 0, Subpt. Y, App., Directive No. 14-95 §§ 1(b)(1)(a)-(c) (1995). Consequently, the Deputy of Asset Forfeiture was not required to seek outside approval for this settlement. The application of Directive No. 14-95 is consistent with the Banar Affirmation, which made no reference to the Chief or Deputy Chiefs of Asset Forfeiture seeking approval from anyone outside the United States Attorney's Office for the Eastern District of New York. Therefore, under the Code of Federal Regulations, AUSA Weber had authority to approve the settlement.

In <u>Burton v. Adm'r, Gen. Serv. Admin.</u> the government unsuccessfully sought to avoid an oral settlement agreement on the same grounds, namely that approval needed to come from a higher channel. No. 89-Civ-2338, 1992 WL 300970, at *1 (D.D.C. July 10, 1992). The United States Attorney's Office represented the General Services Administration ("GSA") at a settlement conference. <u>Id.</u> at *1-2. The AUSA phoned the GSA to ensure the "validity of the offer" and returned to the courtroom to report that "GSA had indeed confirmed that the offer was valid . . . ." <u>Id.</u> The government later argued that the agreement was not binding because of a "misunderstanding within the agency concerning the [settlement] terms" and because the AUSA did not have "the necessary authority to bind the GSA . . . ." <u>Id.</u> at *2-3. The court found that the GSA's Office of General Counsel had authority to settle and did not need approval from higher channels. <u>Id.</u> at *4-5. The court held that the AUSA "needed no more than [the GSA attorney's] consent in order for her to have authorization to offer the proposed settlement terms . . . ." and that she "acted entirely within

---

$500,000 and $5,000,000, <u>so long as the difference between the gross amount of the original claim and the proposed settlement does not exceed $500,000 or 15 percent of the original claim, whichever is greater</u>.

28 C.F.R. Pt. 0, Subpt. Y, App., Directive No. 14-95 §§ 1(b)(1)(a)-(c) (1995) (emphasis added).

her authority", having "every reason to believe that the GSA agreed with the settlement terms." Id. at *4. Thus, the court held that the settlement agreement between plaintiff and the GSA was "valid and enforceable." Id. at *6.

The government has failed to meet its burden that AUSA Weber did not have authority to orally approve the settlement via telephone or that AUSA Knuckles acted inappropriately in relaying that approval to claimants and the Court. Having declined to participate in a hearing, the government has failed to proffer any additional support for its claim. Therefore, I find that AUSA Weber had actual authority to orally bind the government to the terms of the settlement agreement. AUSA Knuckles discussed the final terms of the settlement with him, and informed claimants and this Court during the second half of the conference that the terms were acceptable and that AUSA Weber had given his approval. The government has offered no evidence that Weber did not authorize the settlement terms over the telephone. Like the holding in Burton, this Court finds that AUSA Weber had actual authority to orally bind the government to the settlement terms, and consequently that AUSA Knuckles, relying on that approval, had the authority to bind the government to the settlement in open court.[4]

Even if AUSA's Knuckles or Weber believed they needed authority from outside the Office, they should, and in my experience would, have informed the Court. "If settlement authority is not

---

[4] While the Banar Affirmation confusingly states that "AUSA's may receive approval to verbally contemplate certain terms of a settlement with a claimant's attorney . . ." (Banar Affirm. ¶ 5), nothing was said to claimants or to me to indicate that the phone call to AUSA Weber was to receive "approval to verbally contemplate" terms. The parties had moved well beyond "contemplation" and were in the process of cementing a final settlement agreement. I instructed AUSA Knuckles to call AUSA Weber with that final proposal for his approval and to report back to the Court. She did so and told me that she had received approval for the settlement agreement. Neither claimants nor I had any reason to believe that AUSA Knuckles returned with authority merely to "contemplate" terms, as she was explicitly told by this Court to obtain final approval.

vested in the U.S. Attorney's Office, counsel need only so inform the court." <u>United States v. Cohen</u>, No. CV-94-2843, 1996 WL 1062770, at *2 (C.D. Cal. May 16, 1996). However, it is clear that AUSA Weber did not need to seek approval higher than his own to bind the government. Any attempt by the government to argue so at this time is both disingenuous and unsupported by either the Banar Affirmation or AUSA Knuckles' actions during and after the settlement conference. For all the above reasons, I find that AUSA Weber had actual authority to approve the settlement and did so prior to AUSA Knuckles' report to claimants before me in open court that the settlement was approved by, and acceptable to, the government.

**B.      AUSA Knuckles had Actual Authority to Bind the Government**

I also find that AUSA Knuckles had independent authority, once she received oral approval from AUSA Weber for the settlement amount, to bind the government to the settlement through the drafting of settlement paperwork. In addition to AUSA Knuckles' relaying of AUSA Weber's approval, thereby orally binding the government to the agreement, once she drafted the paperwork and transmitted it to claimants, she satisfied a condition precedent that she would get the approval for the settlement and memorialize the terms in the written document. Thus, the settlement agreement must also be enforced based on this Court's additional finding that the "necessity of government ratification [ ] constitute[d] an implied condition precedent to the maturation of the remaining duties under the settlement agreement." <u>Ostman v. St. John's Episcopal Hosp.</u>, 918 F. Supp. 635, 644 (E.D.N.Y. 1996).

In <u>Ostman</u>, Judge Seybert chastised the AUSA, who attended a final settlement conference, for his reticence regarding settlement authority:

a lawyer[] [has a] duty of candor to the court. This [ ] principle looks unkindly upon attorneys who, knowingly or unwittingly, squander a court's limited resources by appearing at a settlement conference and making an offer of settlement without communicating to all interested parties, and to the court, that such offer exceeds their settlement authority.

Ostman, 918 F. Supp. at 644. In Ostman, the facts of the government's representation were somewhat more tangled, in that the AUSA who represented to bind the government at the settlement conference was standing in the stead of another AUSA who had attended all prior settlement conferences, but was unable to attend due to a scheduling conflict. Id. at 639. Furthermore, the AUSA of record did indeed require approval from the Department of Justice before he was authorized to accept a $750,000 medical malpractice settlement. Id. at 641.

Judge Seybert did not regard "the failure of the government attorneys to disclose that they lacked settlement authority to provide a basis to vitiate the settlement." Id. at 644. Instead, she found that the "condition" that the AUSA receive approval for the settlement amount was an "implied condition precedent to the maturation of the remaining duties under the settlement agreement." Id. Because the AUSA in Ostman was able to secure the Department of Justice's approval for the $750,000 settlement on the same day that a newly passed statute bequeathed him the general authority to approve all settlements up to $1,000,000, the court held that the condition precedent had been satisfied and confirmed the settlement agreement as valid and binding upon the United States government. Id. at 643, 645-46.

The holding in Ostman leads to the same conclusion here. The settlement between claimants Khalil and Soliman and the federal government is valid and binding. Even if AUSA Knuckles did not have the actual authority to orally bind the government to the settlement, she must have garnered that authority prior to mailing the Stipulation to the claimants. According to Banar, an AUSA must

receive prior approval of the settlement terms from either the Chief of Asset Forfeiture or a Deputy Chief prior to drafting and mailing a stipulation to a claimant (Banar Affirm. ¶¶ 5-6). Additionally, once the claimants executed the Stipulation, the last step for the finalization of the settlement was the signature of the AUSA. The Banar Affirmation does not indicate that the AUSA must consult with anyone in the Office or elsewhere before signing claimants' already executed Stipulation (Id. ¶¶ 7-8). In the absence of any evidence that AUSA Knuckles failed to follow this procedure, and in light of the fact that she reported to claimants before me in open court that she had secured approval for the settlement from AUSA Weber, I find that AUSA Knuckles' mailing of the Stipulation to claimants evinced a satisfaction of the condition precedent for final approval of the settlement. Thus, under this analysis of the authorization as a condition precedent, the settlement agreement is binding on the federal government.

Finally, the government cannot argue now that AUSA Knuckles lacked actual authority because when a principal objects to a settlement on the grounds that the agent did not have actual authority, the principal must voice that objection to the court in a timely fashion. See Int'l Bhd., 986 F. 2d at 20-21 (emphasis added) (citing Beirne v. Fitch Sanitarium, Inc., 167 F. Supp. 652, 654 (S.D.N.Y. 1958) ("It is a client's duty to express disapproval of a settlement within a reasonable time, if he has a basis for disapproval. If he does not object he makes the settlement his own.")). See also HNV Cent. River Front Corp. v. United States, 32 Fed. Cl. 547, 550 (1995) (holding that despite argument that attorney lacked authority to bind to settlement agreement, client's "subsequent actions indicate[d] a ratification of the Settlement Agreement") (citing IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp., 26 F.3d 370, 375 (2d Cir. 1994) ("Ratification [ ] may be found to exist by implication from a principal's failure to dissent within a reasonable time after learning what

had been done.")). The fact that the Stipulation was mailed to claimants attests to the Deputy Chief

of Asset Forfeiture, AUSA Weber's approval of the settlement agreement. The government cannot

claim, months after the authorized Stipulation was mailed to claimants, that it did not approve of the

settlement and that AUSA Knuckles did not have the authority to convey those terms and bind the

government to those terms on the day of the settlement conference.

As discussed above, this Court holds that (i) AUSA Weber had actual authority to orally bind

the government to the settlement; (ii) approval of the settlement agreement was an implied condition

precedent demonstrably satisfied when AUSA Knuckles mailed the Stipulation to claimants; and

(iii) AUSA Knuckles had actual authority to bind the government in writing. For all these reasons,

taken together but also standing alone, the government has failed to satisfy its burden that it is not

bound to the settlement.

## II.  The Parties Intended to be Bound by the Oral Settlement Agreement & are Bound by the Unexecuted Stipulation

The government has abandoned its argument that it did not intend to enter into a settlement

at the February 9, 2005 conference. In its March 15, 2006 letter to the Court, the government

conceded "that it intended to enter into the oral settlement agreement at issue and intended to enter

into the written settlement" (03/15/06 Leff Letter). In the Second Circuit, when a party seeks to

enforce an oral settlement agreement, the court employs a four prong test to determine whether the

parties intended to be bound by their oral representations, when they have failed to fully execute

documents to that end. See Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir. 1986).

While the government concedes its intent to enter into an oral settlement, it does not concede its

intent to be bound, and in fact maintains that it is not bound since the settlement agreement was not

fully executed. Under Winston, the Court finds that the government is bound to the terms of the oral

settlement agreement and to the unexecuted stipulation.

**A.      Intent to be Bound under Winston**

It is not only in this Court's power to enforce "summarily, on motion, a settlement agreement

reached in a case that was pending before it," but it is this Court's duty to "enforce a settlement

agreement which it ha[s] approved . . . ."  Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d

714, 717 (2d Cir. 1974) (emphasis added).  See also Colondres v. Scoppetta, 290 F. Supp. 2d 376,

380 (E.D.N.Y. 2003) ("Courts have the inherent power to do all things that are reasonably necessary

for the administration of justice within the scope of their jurisdiction.") (internal quotations and

citations omitted); Haitian Ctrs. Council, Inc. v. Sale, 817 F. Supp. 336, 337 (E.D.N.Y. 1993) ("A

district court may exercise its inherent power to protect the parties appearing before it, to preserve

the integrity of an action, to maintain its ability to render a final judgment and to ensure the

administration of justice.").

The Winston test is not an after-the-fact professed, subjective intent, but rather the parties'

objective intent as "manifested by their expressed words and deeds at the time."  Hostcentric Tech.,

Inc. v. Republic Thunderbolt, LLC, No. 04-Civ-1621, 2005 WL 1377853, at *6 (S.D.N.Y. June 9,

2005) (citing Grupo Sistemas Integrales de Telecomunicacion S.A. de C.V. v. AT & T Commc'n,

Inc., No. 92-Civ-7862, 1994 WL 463014, at *3 (S.D.N.Y. Aug. 24, 1994) (internal quotations

omitted)).  The court must carefully weigh the four factors, first, to ascertain whether the parties

intended to be bound and, second, to ward off a party's attempt to rewrite the history of a case or

manipulate the opposing party.  "[T]he Court must be careful to guard against the possibility that

parties will seek to manipulate settlements to gain strategic advantage, settling and 'unsettling'

litigation to suit their immediate purposes." <u>Media Group, Inc. v. HSN Direct Int'l, Ltd.</u>, 202 F.R.D. 110, 112 (S.D.N.Y. 2001).

The first <u>Winston</u> prong is whether "either party communicate[d] an intent not to be bound until he achieve[d] a fully executed document." <u>Winston</u>, 777 F.2d at 80. Such communication must be an "express reservation of the right not to be bound in the absence of a writing." <u>Id.</u> The second prong is "whether there has been partial performance of the contract." <u>Id.</u> The third prong is "whether all the terms of the alleged contract have been agreed upon. <u>Id.</u> Lastly, the fourth prong is "whether the agreement at issue is the type of contract that is usually committed to writing." <u>Id.</u> "No single factor is decisive, but each provides significant guidance." <u>Ciaramella v. Reader's Digest Ass'n, Inc.</u>, 131 F.3d 320, 323 (2d Cir. 1997).

### 1. Express Reservation Not to Be Bound

Although <u>Winston</u> is a balancing test, the first prong, the express reservation not to be bound, is perhaps one factor with the power to tip the scales slightly more than the other three.

> The first factor, the parties' objectively-expressed intent, is the most important: The Second Circuit has at various times stated that no single factor is decisive, but each provides significant guidance. But the Second Circuit has also stated, in the context of a binding preliminary commitment, that the first factor is the most important.

<u>Hostcentric</u>, 2005 WL 1377853, at *7 (internal quotations omitted) (citing <u>Krauth v. Executive Telecard, Ltd.</u>, 890 F. Supp. 269, 293 (S.D.N.Y. 1995)).

The government admits that it "intended to enter into the oral settlement agreement at issue and intended to enter into the written settlement agreement" (03/15/06 Leff Letter at 1). And, by the government's own admission, AUSA Knuckles did not state at any time to this Court that she did not intend to be bound by the representations made at the settlement conference. The

government baldly asserted, "[C]ommon sense dictates that the government <u>would not make such a reservation</u> since all forfeiture agreements are settled in writing" (Gov't Mem. in Opp'n at 10) (emphases added). Additionally, the government conceded its failure to express a reservation not to be bound with the additional statement, "Claimants' reference to the government's <u>failure to inform the Court that it would not be bound absent a signed agreement</u> is ludicrous, since the Court is well familiar with the fact that this case was handled in the same manner as all other forfeiture proceedings" (<u>Id.</u> at 11) (emphases added).

The above assertions refer to implied reservations based on a professed custom in forfeiture actions. Not a single statement included an express[5] reservation. Regardless of whether it was the Asset Forfeiture Division's custom to memorialize all settlements in written form, that does not obviate the need in a settlement conference, <u>overseen by the court</u> and in which the court directly instructs the parties to acquire authorization for the settlement terms before the cessation of the conference, for the parties to verbally express their intent not to be bound until a final written stipulation is signed by all parties and fully executed.

The government invokes <u>Winston</u> in support of its case against enforcement; however, an evaluation of the facts, under this <u>Winston</u> prong, demonstrates that no explicit reservations were made at the settlement conference. "<u>Winston</u> stands for the proposition that 'if either party communicates an intent not to be bound until he achieves a fully executed document, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.'"

---

[5] "Express" is defined by Webster's Dictionary as follows: "Directly, firmly, and <u>explicitly</u> stated." Merriam-Webster Inc., http://www.webster.com/cgi-bin/dictionary (search "express") (last visited Mar. 30, 2006). Synonyms listed are "exact, explicit and precise." <u>Id.</u> Antonyms of the word are "implicit, implied, inferred, ambiguous, circuitous . . . ." <u>Id.</u>

Artha Mgmt., 91 F.3d at 329 (citing Winston, 777 F.2d at 80). The government's argument "must fail because they have produced no evidence that they 'communicate[d] an intent not to be bound.'" Artha Mgmt., 91 F.3d at 329 (the challenging party must provide "clear evidence" of an intent not to be bound).

The government also misplaces reliance on Ciaramella v. Reader's Digest Ass'n, Inc., where the Second Circuit did find an express intent not to be bound. There are multiple distinctions between Ciaramella and the instant case. In Ciaramella, there were numerous drafts of the settlement agreement circulated, all containing language indicating that the settlement was not effective until executed by all parties and their attorneys. Ciaramella, 131 F.3d at 321; see also Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989) ("references to the possibility that negotiations might fail and the reference to a binding sales agreement to be completed at some future date" evinced an intent not to be bound). While the government's Stipulation included paragraphs that loosely can be termed "reservations", all fail to explicitly state that the parties would not be bound until the Stipulation was fully executed. The reservations that AUSA Knuckles inserted into the Stipulation read as follows:

> (2) Effective upon the United States and Claimants' full execution and delivery of this Stipulation, Claimants hereby agree to release, hold harmless and indemnify the United States, its officers, agents and employees and/or representatives, past and present, from and against any claim for relief or cause of action for any conduct or action in any way connected to or arising from the provisions of this Stipulation.

> (10) This Stipulation constitutes the entire agreement between the parties concerning the resolution of the above-captioned action, and supersedes any prior negotiations, representations, and agreements. No part of this Stipulation may be waived, modified or amended except by another written agreement signed by all the parties.

(Kessler Affirm. Ex. C ¶¶ 2, 10).  Every requirement in paragraph 2 of the Stipulation was satisfied, save the final execution by the government, the party that drafted and circulated the Stipulation. Moreover, claimants are not attempting to add any provision to the agreement that was not already embodied in the Stipulation, as was prohibited by paragraph 10.  Unlike <u>Ciaramella</u>, here the government represented that this case was settled in open court; thus, these boiler-plate reservations were too little, too late, as the government was required, and failed, to expressly reserve the right not to be bound when it stood before me.

It also bears noting that there was no language in Knuckles' correspondence to indicate that the Stipulation was anything other than a final settlement agreement.  In <u>Hostcentric Tech., Inc. v. Republic Thunderbolt, LLC</u>, the parties informed the district judge in writing that they were "pleased to advise the court that this action has been settled," and noted that the parties were preparing paperwork.  2005 WL 1377853, at *2, *7.  Because there were no references to a "proposed settlement" or "proposed stipulations of settlement", and because "both parties referred to there being a conclusive settlement" the court held that the parties evinced an intent to be bound. <u>Id.</u> at *7, *10.  <u>See also</u> <u>Vari-O-Matic Mach. Corp. v. New York Sewing Mach. Attachment Corp.</u>, 629 F. Supp. 257, 259 (S.D.N.Y. 1986) ("since both parties made representations to the court that agreement had been reached, there can be no factual dispute that a settlement had been consummated").

Knuckles' March 8, 2005 letter to Kessler and Freeman, enclosing the Stipulation for their and their clients' execution, did not qualify the stipulation as "proposed" or as a "draft."  (Kessler Decl. Ex. C).  The letter plainly stated, "Enclosed for your clients' execution is the Stipulation of Settlement and Decree of Forfeiture in connection with the above-referenced civil forfeiture case."

(Id.).  This is inapposite to the language employed in Winston, where the parties used correspondence language such as "the proposed agreement" and "the proposed settlement," on which the court concluded the parties intended the "unexecuted versions of the agreement to be nothing more than drafts or proposals and not . . . final binding agreements."  Winston, 777 F.2d at 81 (emphasis added).  AUSA Knuckles' chosen correspondence-language, coupled with her actions, indicates a clear intent to transmit a final Stipulation, the terms of which were unchanged from those settled on before this very Court.  On this weighty Winston factor, the government has not only failed to provide any evidence that it expressly reserved the right not to be bound in the absence of a signed writing, but all of the evidence points to the Stipulation, not as a mere draft, but rather as the embodiment of the final oral settlement, agreed to before this Court.

### 2.    Partial Performance

If the first of the Winston factors has the power to tip the scales slightly more than the other four, it is the second factor that appears to have had the least sway with courts when applying the Winston test.  Nonetheless, I give this factor equal consideration and find that the instant facts establish intent under the second Winston prong.

In Gildea v. Design Distrib., Inc., the court considered plaintiff's failure to prepare, sign or deliver a stipulation of discontinuance to defendant proof that the settlement agreement was not partially performed.  378 F. Supp. 2d 158, 161 (E.D.N.Y. 2005).  The opposite is true here.  At the close of the settlement conference, as instructed by this Court and agreed to by the parties, AUSA Knuckles drafted the Stipulation and mailed it to both claimants for their execution.  Under Gildea, this qualifies as partial performance.  In addition, Kessler discussed with AUSA Knuckles the process through which the money would be transferred, filled out all the required forms, and filed

them with the Department of Treasury. The only acts missing in this transaction were (i) an execution by AUSA Knuckles of the Stipulation and (ii) the final wire of the currency to claimants. If these two matters had been completed, this settlement would be <u>fully performed</u>, and thus the absence of these two acts will not hinder this Court in viewing this settlement as partially performed.

### 3.      Whether All the Terms of the Alleged Contract Have Been Agreed Upon

In <u>Winston</u>, the court scrutinized the terms of the agreement, particularly those negotiated after the settlement was arguably finalized. Although the district court ruled that the additional terms were minor, the Second Circuit stated that even though "these 'unnoticed' or 'passed by' points of disagreement may in the long view be fairly characterized as minor or technical [it] does not mean that a binding contract was formed prior to the time that they were finally worked out." <u>Winston</u>, 777 F.2d at 82. The parties in <u>Winston</u> had several points of disagreement during the drafting process and cycled through a number of drafts. <u>Id.</u> at 82-83. The court held that where "counsel insist on continually redrafting the specific terms of the proposed agreement, the changes made must be deemed important enough to the parties to have delayed final execution and consummation of the agreement." <u>Id.</u>  <u>See also</u> <u>Ciaramella</u>, 131 F.3d at 325 (later drafts of the settlement agreement contained new provisions that were not present in earlier drafts).

Again, the facts here simply do not parallel the facts of <u>Winston</u>. While it is true that Kessler and AUSA Knuckles discussed two issues prior to her drafting the Stipulation, namely apportioning interest and principal and the precise process for transferring funds, and that, after he received the Stipulation, Kessler called Knuckles to discuss some of the terms, <u>none</u> of these "minor" matters necessitated even one additional "draft" of the Stipulation. The <u>first</u> copy of the Stipulation was the <u>only</u> copy, and it was signed by claimants with no objection to <u>any</u> of its terms. Importantly, the

government is not claiming that the settlement terms claimants seek to enforce differ from those reported to this Court on February 9, 2005. Rather, it simply argues that it is not bound to these terms because the Stipulation was never executed.

The government additionally claims that the settlement was not completed at the February 9, 2005 conference since AUSA Knuckles added language to the Stipulation. However, I find that all additional language in this Stipulation is mere boilerplate and, thus, immaterial. See Lopez v. City of New York, 242 F. Supp. 2d 392, 394 (S.D.N.Y. 2003) (boilerplate language is common in most settlement agreements and "will not destroy the settlement"). Furthermore, there is no dispute over the amount of the settlement. See Gildea, 378 F. Supp. 2d at 161 ("The single most important term of the agreement [ ] [is] the settlement amount"). Thus, the third prong of Winston supports a finding that the parties intended to be bound by the oral settlement agreement.

### 4. Whether the Agreement at Issue is the Type of Contract Usually Committed to Writing

The final Winston factor is "whether the agreement . . . was the type of contract . . . usually put in writing." Winston, 777 F.2d at 83. This factor requires an evaluation of the "complexity of the transaction." Id. Since the Winston contract required a payment over several years, based on a percentage of earnings, and the complexity of the agreement required several drafts, the court determined that the nature of the contract demanded it be set in writing. Id. See also Ciaramella, 131 F.3d at 326 (agreement contained numerous provisions that would apply into perpetuity).

"Settlements of any claim are generally required to be in writing or, at a minimum, made on the record in open court." Id.; see also Janus Films, Inc. v. Miller, 801 F.2d 578, 583 (2d Cir. 1986) ("[a] court's authority to enforce a settlement by entry of judgment in the underlying action is

especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings."). In In re Cuffee, the court adopted the following New York Court of Appeals language:

> Stipulations of settlement are favored by the courts and not lightly cast aside. This is all the more so in the case of open court stipulations . . . where strict enforcement not only serves the interest of efficient dispute resolution but also is essential to the management of court calendars and integrity of the litigation process.

232 B.R. 53, 56 (E.D.N.Y. 1999) (citing Hallock v. State of New York, 64 N.Y.2d 224, 230, 485 N.Y.S.2d 510, 512, 474 N.E.2d 1178, 1180 (1984)).

The government argues that, because the settlement was not placed on the record, Janus and Cuffee do not apply. However, in Monaghan v. SZS 33 Assoc., L.P., the Second Circuit upheld the district court's enforcement of an oral settlement agreement, stating that "the parties were together in court . . . and, although a contemporaneous record was not made, they discussed a proposed settlement with the judge." 73 F.3d 1276, 1282 (2d Cir. 1996). Even though the "parties' agreement did not meet the technical requirements of New York law for a binding settlement . . . . substantial compliance" with these requirements was "deemed sufficient." Id. at 1283 (internal citations and quotations omitted). See also Conway v. Brooklyn Union Gas Co. 236 F. Supp. 2d 241, 252 (E.D.N.Y. 2002) ("It is also important to note that the presumption in favor of written settlements or placement of these agreements on the record does not expressly prohibit enforcement of an oral settlement agreement.") (emphasis added).

This Court does not mechanically record each and every civil conference. But all matters before me are nonetheless recorded, i.e. I memorialize the proceedings in a civil calendar that is docketed. The government's argument would certainly fail if the settlement had been tape-recorded.

Still, an agreement represented to me in open court as final is just as binding on the parties as an agreement put on the record. This Court also has grave doubts as to whether the simple act of popping a tape into the Court's electronic recording device and pressing record would have deterred the government from its efforts to renege on this settlement. While the government also makes much of the way the settlement was docketed, I find it immaterial to the enforcement of this settlement whether the docket entry for the settlement conference stated that the case was dismissed with or without prejudice. See Reich v. Best Built Homes, Inc., 895 F. Supp. 47, 48, 50 (W.D.N.Y. 1995) (enforcing settlement that was agreed to orally on the record and "dismissed without prejudice").

The government argues that all Asset Forfeiture Division settlements are embodied in a writing, but Winston "would be a strange test if the fourth factor always favored finding no agreement on the ground that settlement agreements usually are written." Hostcentric, 2005 WL 1377853, at *9 (enforcing the settlement agreement because the challenging party had presented "no evidence that a simple lease termination [was] complex" and because the agreement would last "only the short time necessary for payment and removal of property, not for a lengthy time into the future"). The Stipulation that AUSA Knuckles drafted and which Khalil and Soliman executed with their attorneys was straightforward and simple (Kessler Affirm. Ex. C at 4-5). The only substantive terms mandated that the government return the agreed upon amount to the two claimants (Id. Ex. C at 3-4). The payment to each claimant was in one lump sum and did not include any complicated or drawn-out schedule of payments (Id. Ex. C at 3). Thus, as with the first three prongs, the fourth prong of Winston supports my conclusion that not only did the government intend to enter into the

oral settlement agreement at issue but also that all of the parties intended to be <u>bound</u> by their oral representations at the February 9, 2005 settlement conference.

### 5. Fundamental Fairness

In addition to upholding the settlement agreement based upon the four <u>Winston</u> factors, I enforce the settlement based on a fifth factor of fundamental fairness, considered by my respected colleague, Magistrate Judge Levy in <u>Conway v. Brooklyn Union Gas Co.</u> and adopted by Judge Nina Gershon. In <u>Conway</u>, Judge Levy stated that:

> [a]lthough [fairness] is not ordinarily a factor that courts consider in deciding whether or not to enforce an oral settlement agreement, I am obliged to note that this court is intimately familiar with the settlement, having worked closely with the parties to settle this case, and I believe that the terms to which they agreed are eminently fair and reasonable.

<u>Conway</u>, 236 F. Supp. 2d at 252. In the instant case, I played a hands-on role in the settlement negotiations and was involved in all of the open court discussions. In addition, after hearing the proposed terms and deeming them appropriate and fair to all parties, I instructed the parties to acquire authorization for those terms.

### B. The Parties Are Bound by the Unexecuted Stipulation

The additional twist in this convoluted road to settlement is the fact that AUSA Knuckles did not sign the Stipulation upon Khalil, Soliman, Kessler, and Freeman's return of the signed originals. The government argues that the absence of AUSA Knuckles' signature on that final document renders the settlement invalid. I disagree. In addition to finding that the parties intended to be bound by the oral settlement reached in open court, I also find that the government is bound by its own final, authorized draft of the Stipulation, which memorialized the oral settlement.

"Where [a settlement] agreement is made . . . under the eyes of the court, it is a most solemn undertaking, requiring the lawyers, as officers of the court, to make every reasonable effort to carry it through to a successful conclusion." Warner v. Rossignol, 513 F.2d 678, 682 (1st Cir. 1975). Many courts have upheld the validity of unexecuted settlement Stipulations, as this Court does now, either because the oral settlement agreement when drafted and transmitted between parties evinced the intent to be bound, or, in the alternative, because the document was a binding and enforceable writing, obviating the need for the Winston test. See Mone v. Park E. Sports Med. & Rehab., No. 99 Civ. 4990, 2001 WL 1518263, at *3 (S.D.N.Y. Nov. 29, 2001) (settlement agreement enforceable because "committed to writing in [a] complete and formal draft . . ."); Vari-O-Matic, 629 F. Supp. at 259 ("Failure to complete the formal stipulation papers does not mean that a settlement was not in fact reached."). In Conway, the court found it noteworthy that a "written draft of the settlement had essentially been finalized . . . [since] [t]he terms . . . were substantially complete and largely reduced to writing." Conway, 236 F. Supp. 2d at 251 (internal quotations omitted).

In its March 15, 2006 letter, the government continued to argue against enforcement of the settlement because the Stipulation "was not executed on behalf of plaintiff United States" (03/15/06 Leff Letter at 1). It is unsettling to me that the government would concede that it intended to enter into the oral and written settlement agreements, but now seek to avoid its obligations on the mere technicality that the drafting party did not execute the Stipulation, when all other parties had done so.

In Alipio v. Sec'y of Army, the plaintiff refused to sign the stipulation because he mistakenly believed that a further writing was required to finalize the agreement settling his lawsuit; however, the court enforced "the oral agreement which he had already made before the magistrate judge." No.

28

C-94-0224, 1998 WL 231021, at *3 (N.D. Cal. 1998) (citing Harrop v. W. Airlines, Inc., 550 F.2d 1143, 1144-45 (9th Cir. 1977)). The defendant in Alipio was represented by the United States Attorney's Office. Alipio, 1998 WL 231021 at *1. A Special AUSA drafted and mailed the written settlement agreement to plaintiff. Id. *2. Despite plaintiff's subsequent refusal to execute the document, the court held that the settlement agreement was binding since "[t]he parties gave their spoken assent to the terms described by the magistrate judge, who had been assisting them for more than two hours in arriving at their agreement. The terms were the complete agreement between the parties, with no indication that any other issues remained to be resolved." Id. at *3. In Parker v. United States, the Sixth Circuit found that a settlement, orally agreed upon in a pretrial conference, although unexecuted by either party, bound both the drafting party and the government. No. 86-3799, 1987 WL 44943, at *2 (6th Cir. 1987). After orally settling, in open court, the parties notified the court in writing that the action "had been settled", and the court dismissed the case with prejudice. Id. at *2. The parties subsequently failed to inform the court that the settlement agreement had not been executed, and, when enforcement was sought, the court held that "a settlement in principle had been reached and that the interests of justice mandated" the court enforce the settlement. Id. The Sixth Circuit affirmed and held that both parties were bound to the terms in the documents tendered by the defendant to the government, even though neither party executed a final settlement stipulation. Id. See United States v. United Bhd. of Carpenters and Joiners of Am., No. 90-Civ-5722, 1993 WL 364443, at *1 (S.D.N.Y. Sept. 10, 1993) (holding that a consent judgment drafted and mailed by the government and signed, unchanged, and returned to the United States Attorney's Office by the defendant was "valid, binding and enforceable").

The record strongly suggests that all of the parties would have executed the Stipulation in May 2005, but for the unaccountable delay by AUSA Knuckles and her successor AUSA Leff. Furthermore, the April 2005 conversation between Kessler and AUSA Knuckles indicates that had Soliman and Freeman executed their Stipulation more expeditiously, the Khalil and Soliman Stipulation might have been executed by AUSA Knuckles before her departure from the Office. Regardless of the manifold and unexplained delays, I find that AUSA Knuckles' failure to sign the already partially executed stipulation does not render the settlement agreement invalid or detract in any way from its binding force on the federal government.

## C.    Conclusion

There is a "public interest in promoting settlement of lawsuits..." and the "courts [ ] have a responsibility to promote settlements . . . ." Janus Films, 801 F.2d at 584. Thus, as is my duty and responsibility, I enforce the settlement agreement, orally agreed to on February 9, 2005 in open court and memorialized in a Stipulation, which the government mailed to claimants on March 8, 2005. The parties evinced an intent to be bound by their oral representations in open court, as determined under the four prongs of Winston and the additional consideration of fairness under Conway. In addition, the parties are bound to the memorialized written agreement, although it was not fully executed. Because this Court has a duty to enforce settlement agreements, oral or otherwise, where the parties had the authority to bind their clients and the intent to be bound, the parties are ordered to comply with the terms of the Stipulation which AUSA Knuckles mailed to Claimants on March 8, 2005. Claimants' motion to enforce the settlement is granted.

### III.    <u>Material Misrepresentation</u>

The government argues in the alternative that this Court cannot enforce the settlement agreement because claimants misrepresented their intentions to finance terrorism with the currency before the settlement was reached (Gov't Mem. in Opp'n at 21-23).  The government asserts that it relied on "material misrepresentations" that claimants were legitimate businessmen, and that it has subsequently acquired information proving otherwise.  <u>Id.</u>  These claims are not new to either claimants or this Court.  The government concedes that "it determined that the property at issue was intended to finance terrorism by ultimately being smuggled to Afghanistan" and that this determination was based upon "<u>both</u> information discovered after the settlement discussions and <u>information of which the government had previously been aware</u>" (03/15/06 Leff Letter at 1).

The government cannot now "walk away from the settlement simply because [it] changed [its] mind."  <u>Janus Films</u>, 801 F.2d at 583.  "When a party makes a deliberate, strategic choice to settle, [it] cannot be relieved of such a choice merely because [the] assessment of the consequences was incorrect."  <u>United States v. Bank of New York</u>, 14 F.3d 756, 759 (2d Cir. 1994).  This Court "must enforce a binding oral agreement, notwithstanding that plaintiff may have had a change of heart."  <u>Foster v. City of New York</u>, No. 96-Civ-9271, 2000 WL 145927, *4 (S.D.N.Y. Feb. 7, 2000).

While "[n]o one entering into a settlement agreement [ ] is a soothsayer," the mystic powers of fortune telling were not required in this case.  <u>Bank of New York</u>, 14 F.3d at 759.  Here, accusations that the seized currency was in some way related to terrorism were raised throughout the initial proceedings and the settlement conferences.  The government knew that the "facts surrounding the seizure of the defendant property bore all the hallmarks of money being smuggled

out of the country to finance terrorism" (Gov't Mem. in Opp'n at 22). The government also was cognizant of the "suspicious manner of Khalil's investments with Soliman, much of which was in the form of paying credit card charges that Soliman had incurred" (Id.). While the dangers of terrorism are real and any attempt to finance terrorism must be curtailed, this Court will not second guess the decisions of AUSA's Knuckles and Weber, when they assessed evidence that the money was linked to terrorism, and nonetheless confirmed the settlement. Indeed, as late as April 13, 2005, without reservation or reluctance AUSA Knuckles told Kessler that she would execute his client's Stipulation as soon as she received Soliman's executed Stipulation. Knuckles and Weber had the benefit of a criminal investigation and prosecution, as well as comprehensive civil discovery from which they determined that settlement was in the best interest of the government. The government has provided no evidence, or reason for the Court to consider new evidence, to override that determination. "Such post facto arguments have no force because they are not relevant to the question of enforceability - i.e., the question whether [the parties] entered into a binding settlement." Reich, 895 F. Supp. at 50 (emphasis in original).

## IV. Fees, Costs, Interest, and Disbursements Pursuant to the Equal Access to Justice Act

Claimants move for attorneys' fees and expenses under the Equal Access to Justice Act (the "EAJA" or the "Act"). 28 U.S.C. § 2412. Claimants contend that the government lacked substantial justification for its delays in finalizing the settlement agreement and that the government's disavowal of the settlement agreement was undertaken in bad faith.

The first step toward determining whether claimants can recover their attorneys' fees and expenses under the EAJA is to ascertain whether claimants are "prevailing parties" as required by

the Act. 28 U.S.C. §§ 2412(b) & (d). In <u>Carbonell v. Immigration & Naturalization Serv.</u>, the Ninth Circuit, incorporating a Second Circuit test for determining the prevailing party in a settlement dispute, held that "when a court incorporates the terms of a voluntary agreement into an order, that order is stamped with sufficient judicial imprimatur for the litigant to qualify as a prevailing party for the purpose of awarding attorney's fees." 429 F.3d 894, 901 (9th Cir. 2005) (internal quotation marks omitted). Consequently, claimants are the prevailing party. The second step is to determine whether claimants can recover their costs and fees under either § 2412(b) for the government's bad faith or under § 2412(d) for the government's lack of substantial justification in pursing this claim. Based on the analysis below, I find that claimants do not prevail on their claim for fees and expenses under§ 2412(b) because they have not established bad faith on the part of the government. However, because the government failed to establish that it was substantially justified in its actions from the time of the February 9, 2005 settlement conference through its present posture pertaining to the agreement's enforceability, I find that claimants are entitled to attorneys' fees and expenses under § 2412(d).

## A.    Section 2412(b): Bad Faith Attorneys' Fees

Claimants contend that they are entitled to an award of attorneys' fees under 28 U.S.C. § 2412(b) for the government's alleged bad faith in this case. The EAJA provides in pertinent part that

> [U]nless expressly prohibited by statute, a court may award reasonable fees and expenses of attorneys . . . to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. The United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award.

28 U.S.C.A. § 2412(b). While the "prevailing rule under American common law holds that parties to litigation pay their own attorney's fees regardless of the lawsuit's outcome . . . an exception to this general rule exists when a court determines that an unsuccessful party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." United States v. One Parcel of Property Located at 414 Kings Highway, No. 91-CV-0158, 1999 WL 301700, at *6 (D. Conn. May 10, 1999) (citing Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 258-59 (1975); Wells v. Bowen, 855 F.2d 37, 46 (2d Cir. 1988); Sierra Club v. United States Army Corps of Engineers, 776 F.2d 383, 390 (2d Cir. 1985)) (internal quotation marks omitted). This bad faith exception "permits an award in circumstances in which the common law would have permitted an award against a private party." Oguachuba v. Immigration & Naturalization Serv., 706 F.2d 93, 94 (2d Cir. 1983) (internal quotation marks omitted). This exception is narrowly applied in the Second Circuit, which "allows an award of attorney's fees under the bad faith exception only when the losing party's claims were entirely without color and made for reasons of harassment or delay or for other improper purposes." 414 Kings Highway, 1999 WL 301700, at *6 (citing Wells, 855 F.2d at 46 ) (internal quotations omitted). This is a two part test and requires that the court find both aspects, not merely one. See Kerin v. United States Postal Serv., 218 F.3d 185, 190 (2d Cir. 2000). "The test is conjunctive and neither meritlessness alone nor improper purpose alone will suffice." Wells, 855 F.2d at 46 (citing Sierra Club, 776 F.2d at 390).

The Second Circuit has held that it is much harder to qualify for attorneys' fees under § 2412(b) than under § 2412(d), particularly in light of the different allocations of burden of proof under each section. Under subsection (b), the burden is allocated to the non-government, prevailing party, and in subsection (d) its allocated to the government when it is not the prevailing party. See

United States v. Gladstone, 141 F. Supp. 2d 438, 445-46 (S.D.N.Y. 2001).  See also United States

v. Standard Oil Co. of California, 603 F.2d 100, 103 (9th Cir. 1979).  In addition, "[s]ection 2412(b)

requires far more egregious conduct on the government's part than is required under section 2412(d)

and it exposes the government to liability for costs and fees above and beyond the limit set by

section 2412(d)."  Wells, 855 F.2d at 46.

As discussed in exhaustive detail above, the government's attempt to renege on the

settlement agreement had no support in this circuit's law.  A thorough study of Second Circuit case

law and factually similar cases throughout the country should have made it evident to the

government that it was bound by its oral representations made before this Court, and by the written

stipulation, despite the incompleteness of execution.  However, claimants have failed to satisfy their

burden of proof that the government prolonged the resolution of this case and failed to recognize the

validity and binding power of the settlement agreement in order to harass the claimants, delay the

case, or for any other improper purposes.  See Gladstone, 141 F. Supp. 2d at 445-46.  Although a

consistent pattern of needless and unwarranted delay on the government's part has contributed

significantly and regrettably to the exacerbation of this dispute and delayed its resolution, I find that

the claimants have not proved that the government acted in bad faith and, thus, will recover neither

attorneys' fees nor costs under § 2412(b).

### B.  Section 2412(d): Substantial Justification

Claimants also contend that they are entitled to an award of attorneys' fees under 28 U.S.C.

§ 2412(d) because the government was not substantially justified in its position in this case.  The

EAJA provides in pertinent that:

> [e]xcept as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a) incurred by that party in any civil action . . . brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The Act instructs a court how it should determine whether the government was substantially justified as follows:

> [w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought.

28 U.S.C. § 2412(d)(1)(B). The substantially-justified standard has been interpreted to mean "justified in substance or in the main," not "justified to a high degree." Pierce v. Underwood, 487 U.S. 552, 565 (1988). The action must be justified to a degree which could satisfy a reasonable person and must have a reasonable basis in both law and fact. Id. at 565-66. Even if the government is substantially justified in the underlying action, if it is not justified "in some portions of the litigation," the prevailing party should recover attorneys' fees for that portion of the litigation. Smith v. Bowen, 867 F.2d 731, 735 (2d Cir. 1989). See Hyatt v. Barnhart, 315 F.3d 239, 244 (4th Cir. 2002) ("The award of attorneys' fees to a prevailing party . . . is mandatory unless the government can demonstrate that its position was substantially justified.") (emphasis in original) (internal quotation marks omitted). "If [the district court] found that the [g]overnment's position in any segment of the litigation was not substantially justified it should have awarded fees for the time spent by [prevailing party's] counsel in successfully opposing the [g]overnment's position in that segment." Smith, 867 F.2d at 735. The policy behind this narrower approach is that "the

government should be discouraged from engaging in dilatory or otherwise unacceptable litigation tactics" at all phases of litigation, not merely when initially bringing the action.  Id.

In the Second Circuit, the "government bears the burden of demonstrating the justification for its position . . . and a strong showing must be made to meet that burden."  Envtl. Def. Fund, Inc., v. Watt, 722 F.2d 1081, 1085 (2d Cir. 1983).  See also 414 Kings Highway, 1999 WL 301700, at *4.  Because the burden is on the government to prove it was justified in its actions and position throughout the life of this case, I must find for the claimants.  The government made a paltry attempt to defend its actions, which is recounted in its totality below:

> The law and facts set forth above have demonstrated that the government's position here is "substantially justified" under 28 U.S.C. § 2412(d)(1)(B).  The government has refused to enter into a binding settlement with Claimants based on evidence that the defendant property would likely be used to inflict harm against the United States.  The law and the consistently uniform procedure for settling forfeiture actions make clear that the parties' dealings in this case did not constitute a binding agreement.  Therefore, the government's position is "substantially justified" within the meaning of the Equal Access to Justice Act.

(Gov't Mem. in Opp'n at 24).  The government has made no effort to meet its burden by showing justification for its position on the issues responsible for protracting the execution of the settlement other than to continue its general discussion of terrorism and the government's efforts against it.  As discussed in extensive detail above, the source of this currency, its packaging, the nature of its acquisition by the federal government, the claimants' relationship, and the possibility that the currency was somehow intended to finance or related to terrorism were all issues prior to and during settlement of this matter.  In its opposition papers, the government presented this issue as though it were a new one.  However, the government conceded in its March 15, 2006 letter that it was

"previously [ ] aware" of information that the money might be linked to terrorism, i.e. before the settlement discussions (03/15/06 Leff Letter at 1).

In addition, the government has made no attempt to explain AUSA Knuckles' inaction, absence and the communication void following her April 13, 2005 conversation with Kessler, other than allusions to new information on terrorism. When given the chance to establish a record of the facts and to elaborate on Knuckles' conduct at a hearing before this Court, the government declined.

In conclusion, the position taken by the United States Attorney's Office with regard to the settlement of this case had no reasonable basis in law or in fact. While AUSA Leff was new to this matter, a review of the settlement agreement, executed by claimants, coupled with a review of the history of the settlement proceedings and the case law should have alerted him to the meritlessness of disavowing the enforceability of the settlement agreement. The Second Circuit mandates that the "government [ ] abandon its opposition to the other party as soon as it becomes apparent that its litigation stance is not substantially justified." Envtl. Def. Fund, 722 F.2d at 1086. Once AUSA Leff familiarized himself with the posture of the matter, it should have been clear that he should execute the Stipulation and authorize the release of the settlement funds.

Therefore, the government was not substantially justified within the meaning of § 2412(d) in its refusal to (i) execute the Stipulation; (ii) honor the oral settlement, committed to before this Court; (iii) honor the written agreement, mirroring the oral settlement as drafted by its own counsel and executed by all other parties; and (iv) comply with the terms of the settlement, thus forcing claimants to litigate the matter. Consequently, claimants are entitled to all fees and expenses incurred from April 18, 2005 when they began their journey down the long and convoluted road towards settlement enforcement.

For the foregoing reasons, claimants' application for attorneys' fees, expenses and costs under § 2412(d) is granted. Under this section of the EAJA, the prevailing party is entitled to attorneys' fees at $125.00 an hour. Kerin v. United States Postal Serv., 218 F.3d 185, 189 (2d Cir. 2000) (rate applies to all cases commenced on or after March 29, 1996). Claimants are hereby directed to submit documentation of all expenses accrued in the enforcement of this settlement, in the form of detailed time-reports, receipts, affidavits, and affirmations, including "an itemized statement from any attorney or expert witness representing or appearing in [sic] behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C.A. § 2412(d)(1)(B). The EAJA allows for an hourly rate of more than $125.00 if the "court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). If claimants would like the court to consider an hourly rate other than the $125.00, they are instructed to submit an affidavit and memorandum of law in support of that request with all other documentation supporting the request for attorneys' fees and expenses. All submissions pertaining to fees and costs must be made no later than May 12, 2006.

Claimants' motion to enforce the settlement agreement is granted. This matter is dismissed with prejudice. In addition, claimants' motion for attorneys' fees, expenses and costs under § 2412(d) of the Equal Access to Justice Act is also granted.

**SO ORDERED.**

Dated: Brooklyn, New York
         April 5, 2006

                                        __/s/_____
                                        JOAN M. AZRACK
                                        UNITED STATES MAGISTRATE JUDGE

39